k8a2CarH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CARNEGIE INSTITUTION OF
     WASHINGTON and M7D
4    CORPORATION,

5                   Plaintiffs,              New York, N.Y.

6              v.                            20 Civ. 189(JSR)

7    PURE GROWN DIAMONDS, INC., and
     IIA TECHNOLOGIES PTE., LTD.,
8
                 Defendants.
9
     ------------------------------x
10
     CARNEGIE INSTITUTION OF
11   WASHINGTON and M7D
     CORPORATION,
12
                  Plaintiffs,
13
               v.                           20 Civ. 200(JSR)
14
     FENIX DIAMONDS LLC,
15
                 Defendant.
16
     ------------------------------x        Teleconference
17
                                            Oral Argument
18
                                            August 10, 2020
19                                          3:00 p.m.
20
21   Before:
22                      HON. JED S. RAKOFF,
23                                          District Judge
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.

k8a2CarH

1                              APPEARANCES

2   PERKINS COIE, LLP
         Attorneys for Plaintiffs
3   BY:  MICHAEL CHAJON
         TERRENCE WIKBERG
4        MATTHEW J. MOFFA

5

6   FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP
         Attorneys for Defendants Pure Grown Diamonds, Inc.,
         and IIA Technologies Pte., Ltd.
7   BY:  PARMANAND K. SHARMA
         JOSEPH P. LONG

8

9   GIBBONS, P.C.
         Attorneys for Defendants Pure Grown Diamonds, Inc.
         and IIA Technologies Pte., Ltd.
10  BY:  JONATHAN BRUGH LOWER

11

12  LEYDIG VOIT & MAYER LTD
         Attorneys for Defendant Fenix Diamonds LLC
    BY:  STEVEN H. SKLAR
13       DAVID M. AIRAN

14

15

16

17

18

19

20

21

22

23

24

25

k8a2CarH

1        THE COURT:  This is Judge Rakoff.  Would counsel

2   please identify themselves.

3        MR. WIKBERG:  Hello, your Honor, this is Terry Wikberg

4   from the law firm of Perkins Coie on behalf of plaintiffs.  And

5   with me today is Michael Chajon, who will be presenting our

6   argument today, and Mr. Matthew Moffa.

7        THE COURT:  Okay.  Anyone else?

8        MR. AIRAN:  Yes.  Good afternoon, your Honor.  This is

9   David Airan, of the law firm Leydig Voit & Mayer, on behalf of

10  the Fenix Diamonds defendants in the 200 case, 20 Civ. 200.

11       THE COURT:  Okay.

12       MR. LONG:  And this is J. Preston Long, with Finnegan

13  Henderson, on behalf of the defendants in the 189 matter, Pure

14  Grown Diamonds, Inc. and IIA Technologies PTE.  I am joined

15  today by co-counsel, Anand Sharma.

16       MR. LOWER:  And this is Brugh Lower, from Gibbons,

17  also on behalf of Pure Grown Diamonds and IIA Technologies,

18  co-counsel with Finnegan Henderson.

19       THE COURT:  Anyone here for the plaintiff?

20       MR. WIKBERG:  Your Honor, this is Terry Wikberg.  I

21  previously identified --

22       THE COURT:  Oh, yes.  Thank you very much.

23       So we are here on the motion to dismiss certain

24  counterclaims and affirmative defenses.  In my naiveté, I

25  thought these were motions addressed to the pleadings, but

k8a2CarH

1   defense counsel has favored the Court with all sorts of

2   evidentiary material going well outside the pleadings.

3   Plaintiffs' counsel not so much, although has made reference to

4   certain deposition testimony.  What possible justification is

5   there for that?  And this is addressed first to defense

6   counsel.

7           MR. AIRAN:  Your Honor, I will speak first on behalf

8   of the Fenix defendants in the 200 case.  The primary material

9   that we relied on in opposition to the motion to dismiss was

10  the pleading itself, as well as the transcript of Dr. Frushour

11  in --

12          THE COURT:  The transcript of the deposition and then

13  I am also seeing in the submission by your co-counsel, various

14  notes, handwritten notes, and other sort of stuff, and I ask

15  you again what conceivable, possible justification did any of

16  you have for submitting any of that in connection with a motion

17  directed at the pleadings?

18          MR. LONG:  Yes, your Honor.  J. Preston Long on behalf

19  of the other defendants in the 189 matter.

20          Those materials were submitted in response to the

21  deposition testimony to rebut the points made in the opening

22  brief --

23          THE COURT:  So the fact that the plaintiffs introduced

24  something improperly, which could have been met by a motion to

25  strike or simply two sentences pointing out how that was

k8a2CarH

improper, was instead met by a slew of dozens, maybe even

hundreds, of papers of stuff from you and your colleagues.  Is

that your position, that that is justifiable?

            MR. LONG:  I can tell that perhaps the Court would

have preferred that we had gone the other route by telling

you --

            THE COURT:  The Court is very seriously considering

sanctions on all the counsel here.  You are all with

established firms.  You know better than this.  You know much

better than this.

            My tentative view -- but I will hear if anyone wants

to oppose this -- is to impose a $10,000 fine on plaintiffs'

counsel for wrongly submitting the deposition and a $25,000

fine on defense counsel jointly and severally for their gross

improper submissions in response, all those monies to be paid

by the lawyers and not by the clients.

            Anyone want to challenge that?

            MR. AIRAN:  Yes, your Honor.  David Airan on behalf of

the Fenix Diamonds defendants.

            Your Honor, we did submit the deposition in response

to a footnote in, I believe, plaintiffs' opening brief were

they submitted authority saying that it was appropriate for the

Court to consider the deposition transcript.  So primarily our

citations were to the affirmative defenses and counterclaims

and the deposition that plaintiffs had submitted.  So we

k8a2CarH

1    thought, in view of the authority cited by plaintiff in their

2    opening brief, that it was appropriate to respond to that by

3    submitting the additional sections of that transcript.  That's

4    what we were doing.  We submitted two exhibits --

5          THE COURT:  Well, it was a lot more than the

6    transcript.  Although it was substantially -- there were many

7    pages from the transcript.  Let me just find the submission.

8    Let's see.

9          There is, first, the declaration of Mr. Long which

10   attaches excerpts of the deposition; a laboratory notebook;

11   excerpts from the laboratory notebook; a combined declaration

12   and power of attorney; letters exchanged between Paul Kokulis

13   and James Singer; a declaration executed by Russell Hemley,

14   etc.; a declaration executed by Gary Kowalczyk.

15         Let's just take, for example, the exchange of letters.

16   How is that, even if you thought there was anything to this

17   ridiculous position of plaintiffs that they could cite to the

18   deposition, how is that remotely within the bounds of just

19   responding?

20         MR. AIRAN:  So, your Honor, I can only speak on behalf

21   of Fenix Diamonds, and we did not cite or submit any of that

22   material.

23         THE COURT:  All right, well, then let me hear from the

24   counsel who did submit it.  Hello?

25         MR. CHAJON:  Your Honor, this is Michael Chajon, from

k8a2CarH

1   Perkins Coie, on behalf of the plaintiffs.

2          Respectfully, we weren't the ones that introduced

3   these materials.  The defendants did.  They relied on them

4   extensively in their pleadings.

5          THE COURT:  Excuse me.  I asked a question that was

6   directed to counsel from Finnegan Henderson.  Would that

7   counsel please respond?

8          MR. LONG:  Yes, your Honor.

9          The materials were submitted in support of the

10  pleadings.  The declarations, for example, are part of the

11  public record of the patents in this case, and our

12  understanding for those materials is that it is proper to rely

13  on them.

14         THE COURT:  And what's your authority for that on a

15  motion addressed to the pleadings.

16         MR. LONG:  I don't --

17         THE COURT:  Letters -- by the way, there is no

18  indication in the actual submission, the declaration from

19  Mr. Long, that these were part of any record, but assuming they

20  were, so what?

21         MR. LONG:  I think there is Federal Circuit case

22  law -- I apologize I don't have a case at the tip of my fingers

23  right now, but I understand that it is permissible to cite to

24  the public file history of the patents --

25         THE COURT:  You can cite to the patents, that's public

k8a2CarH

1    record.

2             MR. LONG:  As well as --

3             THE COURT:  You can cite to the entire prosecution

4    history on a motion directed at the pleadings?

5             MR. LONG:  That's my understanding, your Honor.

6             THE COURT:  All right.  I will give the parties until

7    5 p.m. tomorrow to send me letters not to exceed five

8    single-spaced pages justifying, if they can, why any or all of

9    this evidentiary material was presented to the Court on a

10   motion directed at the pleadings.  If I am satisfied that there

11   is ample authority, I will not impose sanctions.  If I am not

12   satisfied, I will impose the sanctions previously mentioned.

13            Now let's move on to the merits of the motion.  Let me

14   hear first from moving counsel.

15            MR. CHAJON:  Good afternoon, and may it please the

16   Court, this is Michael Chajon.

17            THE COURT:  So far very little has.

18            MR. CHAJON:  Understood, your Honor.  This is Michael

19   Chajon from Perkins Coie on behalf of the plaintiffs.

20            Plaintiffs ask the Court to keep two things in mind as

21   it considers our motions to dismiss the inequitable conduct

22   claims:

23            The first shows that defendants, what they really have

24   here is a claim in search of some facts, and we see this in how

25   their pleadings have evolved since May.  This is the

k8a2CarH

1   defendants' second try at raising inequitable conduct claims.

2   They first tried in their original pleadings three months ago,

3   and at that time, they targeted a long list of people,

4   including Dr. Robert Frushour, an inventor on the predecessor

5   '610 patent.

6          So, in May, the defendants accused Dr. Frushour of

7   defrauding the patent office.  After the plaintiffs moved to

8   dismiss, the defendants, they deposed Dr. Frushour --

9          THE COURT:  Wait a minute.  Excuse me.  I don't

10  understand why any of this is before me.  The, I thought,

11  simple question raised by your motion was whether they have

12  sufficiently alleged, consistent with the legal standards,

13  affirmative defense X or counterclaim Y, and the history of how

14  they got there is neither here nor there.  Either they have

15  adequately alleged these counterclaims and defenses, or they

16  have not.  So don't waste my time with telling me the history

17  of the universe.  Why are these, as they are presently worded,

18  insufficient to sustain their affirmative defenses again?

19         MR. CHAJON:  Right.  Agreed, your Honor.

20         So, these allegations fail because the inequitable

21  conduct claims are implausible, and it's unreasonable to infer

22  that anybody at Carnegie or Dr. Li acted with any deceptive

23  intent.  And the legal standard, you know, really plays in

24  here.  But let me mince no words.  The claims are implausible

25  and they fail under any pleading standard.  The rub for the

k8a2CarH

1    defendants is that the heightened standard applies because

2    inequitable conduct claims sound in fraud.  So we are dealing

3    with Rule 9, which requires pleading with particularity.  We

4    are dealing with --

5             THE COURT:  Let me make sure I understand the facts

6    that are alleged, and correct me, because it's been several

7    days since I last looked at these papers.  But if I recall

8    correctly, the original patent was in the name of Dr. Frushour

9    and Dr. Li.  Eventually, a correction was put in by or on

10   behalf of Carnegie saying that Frushour had nothing to do with

11   it and it should be just Dr. Li, and then later on some other

12   people were added.

13            Do I have that much right?

14            MR. CHAJON:  Yes, your Honor.  This is Michael --

15            THE COURT:  All right.

16            MR. CHAJON:  -- Chajon.  Um-hmm.

17            THE COURT:  So they are now saying that you lied; that

18   that Frushour was an inventor.  That may be totally bogus and

19   it may turn out that they will not remotely survive summary

20   judgment on that allegation, but why is that allegation as a

21   facial matter not enough?

22            MR. CHAJON:  Sure.  So I think your Honor kind of hit

23   it on the head there that the deceptive intent, the inequitable

24   conduct allegations, they all flow from this premise, this idea

25   that Dr. Frushour was correctly named an inventor on the '610

k8a2CarH

1   patent, and that he was removed only through fraud, and we see

2   that proclamation that Dr. Frushour was a rightfully named

3   inventor all throughout the pleadings.  But that assertion,

4   that's a legal conclusion.  It's not presumed true on a motion

5   to dismiss.  That's *Iqbal*.  We cited the *Garcia v. Watts* case

6   on that point.  Inventorship is a question of law.  You see

7   that in the *C.R. Bard* case we cited.  So the necessary premise

8   from which all of the inequitable allegations flow, it's not

9   presumed true just because the defendants say it is.  And with

10  no foundation, the claims, they just collapse.

11          THE COURT:  Wait a minute.  You have just said several

12  things that I don't fully understand.

13          Are you simply saying that they did not allege more

14  specific facts to show that Dr. Frushour was an inventor or

15  coinventor or are you saying something else?

16          MR. CHAJON:  No.  Your Honor, I'm saying -- you are

17  correct.  So, they allege facts about Dr. Frushour's supposed

18  role based on his deposition testimony and his oath that went

19  into the patent office, but the facts that are alleged, they

20  just don't -- they can't lead to the reasonable inference that

21  Dr. Frushour was an inventor, because it's clear from those

22  same documents that he lacked the information that he needed to

23  determine if he was.

24          So we think, there is just -- you know, based on the

25  pleadings, based on the documents the defendants rely on for

k8a2CarH

1   their pleadings --

2          THE COURT:  So this, as I understand, is why you

3   thought you could cite the deposition, since it was responsive

4   to what you think they were relying on in their complaint or in

5   their counterclaims and answer and so forth.  Do I have that

6   right?

7          MR. CHAJON:  Yes.  That's right, your Honor.

8          THE COURT:  All right.  So I'm not quite clear, on the

9   facts, what you are saying makes the claim -- you know, let us

10  say that, based on whatever sources, they assert Dr. Frushour

11  was the inventor because he did X and Y and because he signed

12  Z.  It cannot be that you are seeking to dismiss the claim on

13  the grounds that he is lying.  That clearly would be a summary

14  judgment or trial, usually a jury trial issue.  What you are

15  saying, I think, with respect to at least the deposition-based

16  portion is that they are taking it out of context.  But on a

17  motion to dismiss for pleading, is that really a ground on

18  which I can dismiss?  That seems to me on its face something

19  that can be argued both ways.

20         MR. CHAJON:  Your Honor, we believe these claims can

21  be dismissed because even with, you know, this presumed truth

22  that Dr. Frushour was an inventor, they haven't alleged facts

23  that make it reasonable to infer that Carnegie or anybody at

24  Carnegie or that Dr. Li knowingly made a false statement to the

25  patent office or material omission and that they did so with an

k8a2CarH

1  intent to deceive, and those are their --

2          THE COURT:  I think they are alleging there -- and,

3  again, it has been a couple of days since I looked at this --

4  but my recollection is they are in effect alleging a kind of

5  reckless disregard, that he wasn't contacted, this was an

6  assertion made without any adequate basis to make the assertion

7  in connection with the amended patent, and so that shows the

8  requisite knowledge and intent.

9          MR. CHAJON:  Your Honor, we don't believe that those

10  alleged facts make it reasonable to infer deceptive intent on

11  behalf of Carnegie or anybody at Carnegie.  For example, this

12  notion that Carnegie failed to contact Dr. Frushour, you know,

13  that obligation did not exist.  Their -- it is not required by

14  patent office rules or regulation or statute that Carnegie

15  reach out, have had reached out to Dr. Frushour or that they

16  had collaborated, if you will, in the correction --

17          THE COURT:  So let me make sure I understand that

18  argument.

19          So there is a patent that's been approved that says

20  that Dr. Frushour is the coinventor, and in your view, if

21  someone tells you, oh, no, he wasn't really the inventor, you

22  can go ahead and file to have him removed as an inventor

23  without any further inquiry on your part?  Is that what you are

24  saying?

25          MR. CHAJON:  No, your Honor.  That's not what I am

k8a2CarH

1   saying, and that's not what happened here.  We had the

2   declaration from the Carnegie scientists that went into the

3   prosecution record before that where the Carnegie scientists

4   explained their role.  It is evident from that fact and from

5   the prosecution --

6          THE COURT:  Assuming that is properly before me, which

7   is, of course, a question we have already been debating.

8          But, anyway, go ahead.

9          MR. CHAJON:  Yeah, your Honor, that declaration is

10  mentioned in detail in the pleadings, so we do believe that it

11  is --

12         THE COURT:  Okay, all right.  Yeah, if it's mentioned

13  in the pleadings, you are right, forgive me, then it can be

14  considered in full.

15         MR. CHAJON:  Right.

16         So just the notion that Carnegie conducted no

17  investigation, that it buried its head in the sand and was

18  willfully blind, that just doesn't follow from the facts that

19  are in the pleadings and from, you know, the prosecution

20  records.

21         THE COURT:  All right.  Let me hear from defense

22  counsel.

23         MR. AIRAN:  Do you have a preference, your Honor, as

24  to which defense counsel goes first?

25         THE COURT:  Whoever is sufficiently masochistic to

k8a2CarH

1   want to go first is fine.

2          MR. AIRAN:  Maybe I will take the lead, then.  This is

3   David Airan on behalf of the Fenix defendants.

4          I think your Honor got it exactly correct when you

5   said that the issue is whether Dr. Frushour is an inventor and

6   whether there was a false declaration in connection with a

7   statement that they made in the reissue application declaring

8   him not to be an inventor.

9          The linch pin of the inequitable conduct defense is

10  that Dr. Frushour was an inventor and is an inventor.  He was

11  presumptively named an inventor in the '610 patent, which was

12  the original patent.  He did the work that was related to that

13  patent.  He wrote the patent application.  So there is his

14  testimony in the record through his original oath, there is

15  deposition testimony, and then there is the corroboration of

16  the patent application itself, which he wrote.  So it is our

17  view that we have adequately pleaded that Dr. Frushour was an

18  inventer.

19         Secondly, the inequitable conduct defense relates to

20  the oath or the declaration that was made under 18 U.S.C. §

21  1001 that stated that Dr. Frushour was not an inventor and that

22  was an untrue statement.  Because that was an untrue statement,

23  the entire patent is invalid or is unenforceable due to

24  inequitable conduct.  And we have cited three Federal Circuit

25  cases in which the Court of Appeals has affirmed findings of

k8a2CarH

1    inequitable conduct based on an intentional decision to omit or

2    to improperly represent inventorship, and so we believe we have

3    stated a case for inequitable conduct on the basis of the facts

4    pleaded.

5             As to intent to deceive, it is very difficult for me

6    to imagine that there is -- that there is anything other than a

7    plausible intent to deceive when a party submits a false

8    declaration under oath stating that Dr. Frushour was not an

9    inventor.  The patent office accepted that statement and it

10   corrected the patent, if you will, to declare him not to be an

11   inventor.  And in our view that was not a victimless decision

12   by Carnegie.  They attacked Dr. Frushour in correcting the

13   patent.  They besmirched his dignity, his reputation, his

14   legacy.  He is out there with the patent, the '610 patent, and

15   they take it away from him, and nobody wants that reputational

16   hit.

17            So it's our view that Carnegie, at the very minimum,

18   acted with willful blindness with respect to Dr. Frushour's

19   contributions here.  for the price of a telephone call, they

20   could have said, hey, what did you do here?  Let us know.  Let

21   us have this discussion.

22            But Carnegie knew at the time of the original patent

23   application that the inventorship question was hotly disputed.

24   They knew when they filed their own patent application that

25   Dr. Frushour and Dr. Li claimed to be the inventors and the

k8a2CarH

1    Carnegie scientists claimed that they alone were the inventers.

2    They submitted a separate patent application that did not

3    identify either Dr. Frushour or Dr. Li as inventors.

4            So Carnegie, if they wanted to do this fairly and they

5    wanted to give Dr. Frushour an opportunity to defend his

6    position as to inventorship, had a few options available to

7    them.  The first option was to move forward with the patent

8    application that they had filed and try to prove in the patent

9    office that they were the first and true inventors.  They

10   didn't do that.  They abandoned --

11           THE COURT:  Is Dr. Frushour currently employed by any

12   of the defendants?

13           MR. AIRAN:  He is not, your Honor.  It is my

14   understanding that he is retired.

15           THE COURT:  So while he may have been injured, how are

16   you injured?

17           MR. AIRAN:  The problem is with the false declaration.

18   The injury is to the patent office.  They intended to deceive

19   the patent office, and did deceive the patent office, in

20   issuing a patent to the Carnegie scientists and Dr. Li and

21   removing Dr. Frushour, who is an inventor.  And under the case

22   law that we have cited, that is inequitable conduct.  In fact,

23   in the *Frank's Casing* case that we cited --

24           THE COURT:  So let me make sure I understand you.  Are

25   you saying you don't have to show any injury of this

k8a2CarH

1   inequitable conduct?

2          MR. AIRAN:  That is correct, your Honor.  The injury

3   is upon the patent and the patent office itself.  There is a

4   fraud here when they declared Dr. Frushour not to be an

5   inventor.

6          And the *Frank's* case, from the Federal Circuit, we

7   think is perhaps the most illustrative on that point, where

8   even the true inventor was denied an opportunity to have his

9   patent because of the fraud of another person.  So it is an

10   extreme remedy, but the entire patent system depends on the

11   candor of the applicants, and when someone like Carnegie makes

12   a false declaration saying that Dr. Frushour is not an

13   inventor, when in fact he was an inventor, that affects the

14   validity of their patent.  And when you look at the declaration

15   that the Carnegie employee signed stating that Dr. Frushour was

16   not an inventor, they did expressly recognizes that the

17   validity of the patent may be called into question if that

18   statement is false.

19          THE COURT:  All right.  Before I hear from plaintiff

20   in rebuttal, anything from codefendant?

21          MR. LONG:  Yes, your Honor.

22          On the question of injury, I just would like to at

23   least point out that in a sense this is rewriting history a

24   little bit.  You know, Carnegie inevitably is going to go

25   before the jury and say, you know, look at the great things

k8a2CarH

1    we did and that we invented, and obviously there is some

2    question to that.  And so just because they have been able to

3    put their name on the patent, that at least is an injury.  But

4    I agree that we don't need to show one here for inequitable

5    conduct.

6         I would also like to just point out that, separate and

7    aside from the fact of who was an inventor -- and we obviously

8    believe that Frushour was an inventor -- the mere fact that, in

9    the reissue declaration, Carnegie's representative,

10   Mr. Kowalczyk, and it was filed by their outside counsel,

11   Mr. Kokulis, the mere fact that they said they knew something

12   when they didn't, they said we know Frushour is not an inventor

13   and that our scientists are, that was a misrepresentation, and

14   they knew it.  They knew they didn't have enough information

15   because they knew -- no one knew what Frushour did or when he

16   did it.  And without knowing that information, you have no

17   good-faith basis for saying we know there was an error.

18        In fact, the brief of plaintiffs recognizes this.  In

19   their reply, at pages two to three, it said, that "Carnegie has

20   no need to contact Frushour if they know their work constituted

21   invention and that it predated Frushour's activity."  But, you

22   know, the pleadings here clearly allege that they had no such

23   knowledge.  We refer to the declaration submitted in the failed

24   interference, which expressly states that the scientists had no

25   pertinent knowledge of Robert H. Frushour.  We referenced the

k8a2CarH

1    several letters in which Carnegie expressly said, we have no

2    intent and no obligation to contact Dr. Frushour to find out

3    what he did or when.

4             THE COURT:  I can't consider any of that.  That's, of

5    course, a question you are going to be addressing in your

6    letter.

7             MR. LONG:  Yes, your Honor.  We reference the letter

8    specifically in our pleadings, which is why they are part of

9    the pleadings.

10            THE COURT:  Okay.  I agree with you -- I will have to

11   obviously check -- anything referenced in the pleadings can be

12   cited, but not if it's not cited in the pleadings, it can't be,

13   in my view.  But I'm waiting for you to educate me further on

14   that score.

15            MR. LONG:  Thank you.

16            THE COURT:  All right.  I'm sorry.  I interrupted you.

17   Anything further you wanted to say?

18            MR. LONG:  Yes.  I will just say that the plaintiffs

19   essentially admit that this didn't happen.  Again, in their

20   reply, at page six, they say "Defendants latch on to a supposed

21   lapse on Carnegie's part."  They say that Carnegie couldn't

22   assess Frushour's inventorship because they had no knowledge of

23   Frushour, and they basically admit that that's what happened

24   because they say if that defect is fatal to Carnegie, it is

25   likewise fatal to defendants.

k8a2CarH

1            Well, that's not true because Dr. Frushour didn't

2     have to submit a declaration saying that Carnegie is not an

3     inventor.  It goes the other way around.  Carnegie had to

4     expressly say, We have a good-faith basis for saying that

5     Frushour was not an inventor and that our folks were.  And to

6     have that good-faith basis, they had to know what Frushour did

7     and when.  That is the *3D Medical Imaging* case that we cited.

8     That's grounds for inequitable conduct, saying that you know

9     something that you don't to the patent office.

10           So I think, you know, in addition to all of the things

11    that our codefendant said, that's also a basis for inequitable

12    conduct here.  Separate and aside from the, you know, who is

13    the true inventor, you can't tell the patent office you know

14    something when you know you don't know it.  And we have

15    sufficiently pled that, certainly, under Rule 9(b).

16           THE COURT:  All right.  Let me hear from plaintiffs'

17    counsel.

18           MR. CHAJON:  Your Honor, this is Michael Chajon from

19    Perkins.

20           This allegation that Carnegie was speaking about

21    something it didn't know about or that it said anything false

22    is just -- it's not supported by the facts, the alleged facts

23    in the pleadings.  We know from the pleadings that the Carnegie

24    scientists had gone on record with the PTO and explained their

25    roles in the invention and their communications with Phoenix

k8a2CarH

1    Crystal, Dr. Frushour and Dr. Li's company.  So per the

2    pleadings themselves, Carnegie had a basis to know what

3    Dr. Frushour, what Phoenix was doing.  They also knew what they

4    were doing.  So there is no -- there is no legs to this

5    argument that Carnegie was speaking to something they didn't

6    have information about or that it was willfully blind to the

7    facts it needed to know.

8            And even beyond that, your Honor, they are still

9    missing the second half of the inequitable conduct analysis,

10   which is the deceptive intent.  Again, we heard from Fenix's

11   counsel this notion that deceptive intent is shown because they

12   didn't call Dr. Frushour.  They had no obligation to call

13   Dr. Frushour.  That's not required by the rules.  They are the

14   owner, they are the assignee of the patent.  The rules make it

15   clear that, you know, they have certain rights they can

16   exercise and certain corrections.  They also had already gone

17   on record with the PTO and told them -- you know, explained

18   their role.  After they acquired the '610 patent, had they kind

19   of done nothing and just let it stand as it was with the

20   inventorship like it was, that arguably would have risked the

21   validity and enforceability of their patent, had they not

22   corrected it after they had gone on record with the PTO telling

23   them there was an issue.

24           What else do the defendants --

25           THE COURT:  They -- excuse me.

k8a2CarH

1          MR. CHAJON:  Yes.

2          THE COURT:  With respect to alleging intent, just so

3   that I am clear what your argument is, Rule 9(b), of course,

4   requires fraud to be pled with particularity, but not states of

5   mind.  It is different, for example, from the PSLRA and

6   securities cases where you have to make a factual showing of

7   fraudulent intent.  There are some cases under 9(b) that

8   support the notion that you also have to show intent, but they

9   are -- and this is in the context of fraud, but they are a

10   minority.

11          Now, I think it is undisputed that, to prevail on

12   these claims, they have to show all elements by clear and

13   convincing evidence.  So that may be where you find the

14   suggestion that they also have to show more than they have

15   shown of intent.  But otherwise I'm not totally sure where you

16   are getting that from.

17          MR. CHAJON:  Sure, your Honor.  I can address that.

18          So the application of Rule 9(b) to inequitable conduct

19   pleadings, that's the *Exergen* case from the Federal Circuit;

20   and under that case, it has to be reasonable to infer the

21   scienter, it has to be reasonable to infer from the alleged

22   facts that the applicant, the patent applicant, had knowledge

23   of the supposedly withheld material or the supposedly false

24   representation.  And it also has to be reasonable to infer from

25   the alleged facts that the false statement or misrepresentation

k8a2CarH

1    was made with an intent to deceive.  That's what we are relying

2    on, your Honor, that they failed to meet this *Exergen*

3    requirement for particularized facts that make it reasonable to

4    infer that Carnegie acted with deceptive intent or that Dr. Li

5    did.

6              THE COURT:  So I will read those cases carefully.  I

7    have not done so yet.  But maybe you can just tell me, from

8    your familiarity with the case, so since 9(b), on the face of

9    9(b), excludes states of mind from its particularity

10   requirement, but of course that's in the context of fraud

11   generally, where did the Federal Circuit get this heightened

12   pleading requirement with respect to intent?

13             MR. CHAJON:  Well, your Honor, I think it came from

14   Rule 9, and it also comes from the kind of interplay between

15   the heavy burden on the merits stage and the pleadings

16   requirement.  There is a very heavy burden set at the merits

17   stage for inequitable conduct.  To ultimately prevail, the

18   defendants need to show that the inference of deceptive intent

19   is the single most reasonable inference able to be drawn from

20   the evidence.  That's from Federal Circuit cases, the

21   *Therasense* case the *Star Scientific* case, and because of that

22   high bar on the merits --

23             THE COURT:  So, I am just looking at Rule 9(b).  "In

24   alleging fraud or mistake, a party must state with

25   particularity the circumstances constituting fraud or mistake.

SOUTHERN DISTRICT REPORTERS, P.C.

k8a2CarH

1   Malice, intent, knowledge, and other conditions of a person's

2   mind may be alleged generally."

3          So Rule 9(b), on its face, accepts from the

4   particularity requirement matters of intent.  So I come back

5   to -- and, again, I haven't looked at the Federal Circuit case,

6   and, you know, I am bound by that case, although I will note

7   that I think the Federal Circuit has displaced the Ninth

8   Circuit as having the highest percentage of reversals by the

9   Supreme Court of the United States.  But, nevertheless, I'm a

10  lowly district court.  I am bound by what they say.  But where

11  are they getting this?  It can't be from Rule 9(b).  I just

12  read it to you.

13         MR. CHAJON:  Your Honor, I think -- let me see.  I can

14  say this, which I think will hopefully put your Honor's mind at

15  ease a bit, is that our position and what we believe is that

16  these deceptive intent allegations are just not plausible.

17  Even putting aside the Rule 9 standard and *Exergen*, they are

18  just not plausible given the facts that are alleged.

19         THE COURT:  I agree with you that plausibility has to

20  be shown.

21         MR. CHAJON:  Right, and why do we think they are so

22  implausible?  It is because -- it's what we were talking about

23  earlier, that the deceptive intent kind of allegations, they

24  all flow from these -- well, first from the obligations that

25  supposedly existed before the patent office that didn't.  You

k8a2CarH

can't infer deceptive intent from Carnegie's choice to do
things that were allowable under the rules.

What's left after that?  The defendants, they point to
like this far-fetched scheme, some underhanded conspiracy
between Carnegie and Dr. Li to steal a patent, and they even
allege that Dr. Li struck some shady back-alley deal with his
friends, where he would help them, you know, Carnegie steal a
patent if they left him on as an inventor.  There is no factual
support for any of those allegations.  This incredible scheme,
it's implausible on its face, and you can't reasonably infer
inequitable conduct or deceptive intent from any of those
allegations.

What I will -- staying with Dr. Li for a minute, the
defendants, they really try to paint him between a rock and a
hard place.  They argue that, no matter how you look at the
facts, he committed inequitable conduct.  They allege that he
either failed to disclose Carnegie's role in the invention or
that he falsely attested to Frushour's inventorship status.
But what do they rely on for that?  It's the unremarkable fact
that Dr. Li signed a standard form inventorship oath that went
in with the original application.  And they read a lot into
that oath, but what did the oath say?  Dr. Li, he just said:
"I believe I am an original, first and joint inventor of the
subject matter which is claimed and for which the patent is
sought."  So he made no comment about anybody else's inventor

k8a2CarH

1    status, just his own.

2            And what's more, it was true.  He was and still is a

3    coinventor.  The defendants don't dispute that.  Dr. Li was

4    listed as a coinventor on the original application on the '610

5    patent, and he still is today on the reissued '189 patent.  So

6    no inequitable conduct, no false statement, no material

7    omission, no deceptive intent can be inferred --

8            THE COURT:  Dr. Li was submitting that on behalf of

9    Carnegie, right?

10           MR. CHAJON:  No, your Honor.  That oath was submitted

11   with the original application.

12           THE COURT:  With the original.  I see.  Well, the

13   original named -- of course he didn't say he was the sole

14   inventor, because the original said there were two inventors.

15           MR. CHAJON:  Right.  All his oath said is that he was

16   a joint inventor.  He didn't speak to anybody else's status.

17           THE COURT:  So what was the basis on which the

18   application that was made to change this to remove

19   Dr. Frushour?

20           MR. CHAJON:  Excuse me, your Honor?  What was the

21   basis for Carnegie's choice to -- or Carnegie's correction of

22   the inventorship?

23           THE COURT:  Yes.

24           MR. CHAJON:  Well, Carnegie knew what it had done.

25   You know, the Carnegie scientists, as I mentioned, through that

k8a2CarH

1    earlier interference declaration, were on record with the

2    patent office explaining their roles, so they were just seeking

3    to correct the patent, which is exactly what they have been

4    trying to do this whole time, from when they first learned that

5    Dr. Li and Dr. Frushour had filed this application.  What did

6    they do?  They filed their own application with the

7    declaration.  They started interference, and then after that,

8    they took steps to acquiring the patent, and once they acquired

9    it, they corrected the inventorship and put their scientists

10   on.

11             THE COURT:  Well, wait a minute.  When you say they

12   corrected it, they corrected it by removing -- asking the

13   patent office to remove Dr. Frushour as an inventor, right?

14             MR. CHAJON:  Yes, that's right.

15             THE COURT:  What was the basis for doing that?

16             MR. CHAJON:  It was their belief that there was an

17   error, that he was listed as an inventor by error.  And --

18             THE COURT:  A belief based on what?

19             MR. CHAJON:  Well, based -- we are talking about the

20   pleadings here, your Honor, so what we do know from the

21   pleadings --

22             THE COURT:  You are -- I was waiting for you to say

23   that, because this question goes beyond the pleadings, and if

24   you want to take the civil equivalent of the Fifth Amendment,

25   you can, but since both sides have been busy telling me how

k8a2CarH

1    much beyond the pleadings one can go in this area, I thought

2    you might want to answer my question on the merits.

3              MR. CHAJON:  We are happy to discuss the merits, if

4    your Honor would like.

5              THE COURT:  No, just right now.

6              MR. CHAJON:  Sure.

7              THE COURT:  What was the basis on which you concluded

8    that Dr. Frushour was not an inventor?

9              MR. CHAJON:  Your Honor, we are -- we are not ready to

10   proffer any facts on anything beyond what's in the prosecution

11   record and in the pleadings today, but what we do know from the

12   pleadings and the records is that Carnegie had its scientists

13   explain their role in the invention and their roles in the work

14   they did with Dr. Li while he was at Phoenix Crystal, so that

15   seems to have been the basis of their later choice to correct

16   the inventorship to remove Dr. Frushour.

17             THE COURT:  All right.

18             Let me hear finally from defense counsel briefly if

19   they have anything further they want to say.

20             MR. AIRAN:  Yes, your Honor.  This is David Airan on

21   behalf of the Fenix defendants.

22             I would say that, in response to the intent to deceive

23   question, certainly submitting a false declaration that

24   Dr. Frushour was not an inventor is intending to deceive with

25   respect to the inventorship question, and that is the holding

SOUTHERN DISTRICT REPORTERS, P.C.

k8a2CarH

1     of the Federal Circuit cases that we have cited.  And an intent

2     to deceive can be based purely on completely false statements

3     to the PTO.  And that's what happened here, and that's our view

4     of what happened here.  So we believe that we have adequately

5     pleaded intent to deceive as well.

6               That's my final comment.

7               THE COURT:  All right.

8               MR. LONG:  Your Honor, if I may just very briefly.

9               THE COURT:  Absolutely.

10              MR. LONG:  The exchange of plaintiffs kind of shows

11    why we have plausibly pled inequitable conduct here.  The facts

12    only show, or at least all that's been pled and all that we can

13    tell from the record, the public record, is that the Carnegie

14    scientists knew what they did and they had a belief that they

15    invented something.  What they didn't know was what Frushour

16    did and when he did it, and without that they had no good-faith

17    basis for removing him.  And so that's the source of the

18    inequitable conduct here and I think we have pled that

19    adequately.

20              THE COURT:  All right.

21              So I thank all counsel for their very helpful

22    arguments.  Obviously I need to get now much more deeply into

23    the cases, but I will get you a decision by the end of August.

24              On the question of whether you exceeded what was

25    legally permitted in terms of submissions, I will look forward

SOUTHERN DISTRICT REPORTERS, P.C.

k8a2CarH

1    to seeing your letters by close of business tomorrow, and then

2    I will rule promptly on that.

3              Is there anything else that we need to take up today?

4    Very good.  Thanks very much.  Bye-bye.

5                               oOo