KBOCCARC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARNEGIE INSTITUTION OF
WASHINGTON, et al,

                    Plaintiffs,

             v.                          20CV00189
                                         Telephone Conference
PURE GROWN DIAMONDS, INC. et
al,

                    Defendants.

------------------------------x

                                         New York, N.Y.
                                         November 24, 2020
                                         3:32 p.m.

Before:

                    HON. JED S. RAKOFF,

                                         District Judge

                         APPEARANCES

PERKINS COIE LLP
     Attorneys for Plaintiffs
BY:  TERRENCE WIKBERG
     MATTHEW MOFFA
     MICHAEL CHAJON

LEYDIG, VOIT & MAYER, LTD.
     Attorneys for Defendants
BY:  STEVEN SKLAR
     DAVID AIRAN
     MAXWELL SNOW

KBOCCARC

1                      (The Court and all parties appearing telephonically)

2                      THE COURT:  This is Judge Rakoff.  Would counsel

3       please identify themselves for the record.

4                      MR. WIKBERG:  Good afternoon, your Honor.  This is

5       Terrence Wikberg from Perkins Coie representing plaintiffs.

6       With me today is Mr. Matthew Moffa and Mr. Michael Chajon.

7                      THE COURT:  Good afternoon.

8                      MR. WIKBERG:  Good afternoon, your Honor.

9                      MR. SKLAR:  Good afternoon, your Honor.  This is

10      Steven Sklar on behalf of the defendant, Fenix Diamonds.  And

11      with me today is David Airan and Maxwell Snow.

12                     THE COURT:  Good afternoon.  All right, we have

13      limited time.  I've already told the parties that moving

14      counsel have 20 minutes followed by 25 minutes for the

15      response, plus 5 minutes for rebuttal.

16                     So, let's hear from moving counsel.

17                     MR. SKLAR:  My colleague, David Airan, would like to

18      start for the defendants.  I'm sharing my screen, your Honor.

19      I don't know if you're able to see that?

20                     THE COURT:  Yes.

21                     MR. AIRAN:  So, at the outset, your Honor, I didn't

22      realize we had 20 minutes, but I will do my best to abbreviate

23      my presentation.  So if you can let me know if I'm getting too

24      verbose, I would appreciate that.

25                     At the outset, I wanted to note to the Court that

KBOCCARC

1   Fenix is the defendant in this case, but it is a seller of

2   diamonds, it does not manufacture diamonds.  The asserted

3   claims in this case, I'll recite methods for diamond

4   production, as Nouveau Diamonds, LLP, is the actual party that

5   makes the diamonds and supplies them to Fenix.

6          Plaintiffs in this case chose not to pursue Nouveau as

7   the defendant and, instead, chose to pursue Fenix, the reseller

8   of these diamonds as the infringer under 271(g).

9          We have cited, in our opening brief and in our reply

10  brief, a case, *Mirror Worlds v. Apple*, 692 F.3d at 1351.  That

11  makes clear that a plaintiff must show all steps of the claims

12  method are performed.

13         So, in this case, those steps of the claimed method

14  must be performed by Nouveau, which is the party that actually

15  produces the diamond, because Fenix, the actual defendant in

16  this case, does not make the diamonds, but somebody has to

17  perform all of the claims stuff, and in this case, that is

18  Nouveau.

19         The motion for summary judgment in this case is

20  warranted for the two patents that are asserted; there is the

21  078 patent and the 189 patent.  My colleague, Steve Sklar, will

22  be addressing the 189 patent and I will be addressing the 078

23  patent.

24         In connection with the 078 patent, the parties dispute

25  a claim construction matter, predominantly.  That's a legal

KBOCCARC

1    matter, that is not a question of fact.  And so, we think

2    summary judgment here is warranted as a matter of law.

3           The central question in this case, we think, was

4    decided in the Markman order.  The Court issued its Markman

5    order on May 8th in this case, and the Court did a very concise

6    and careful description of the 078 patent as describing a

7    method for improving upon earlier microwave plasma CVD

8    techniques.

9           In particular, the prior methods had a tradeoff

10   between diamond growth rate and quality.  As the growth rates

11   went up, the MPCVD processes resulted in unwanted artifacts,

12   such as twinning and polycrystalline.  That was the problem

13   that the prior art had, according to the 078 patent, and is

14   recognized by the Court in its Markman order.

15          The 078 patents, as the Court cited in the order at

16   page 4, it claims to improve upon the prior art by producing

17   single-crystal MPCVD diamonds at a higher growth rate, and that

18   result, meaning the single-crystal diamond growth, was achieved

19   by creating temperature and pressure conditions that fall

20   within particular ranges and, importantly, by controlling the

21   temperature gradients across the growth surface of the diamond

22   seed, such that they are less than 20 degrees C.

23          So, as we have up on the screen now, the problem, as

24   described by the 078 patent, was polycrystalline growth on the

25   edges of the growth surface.  The solution was particular

KBOCCARC

1    temperatures or pressures to be used in the creation of these

2    diamonds, as well as maintaining the surface temperature

3    gradients to be less than 20 degrees C would result in the

4    production of single-crystal diamonds with insubstantial

5    nonmonocrystalline growth.

6            So the secret sauce here, if you will, was the surface

7    temperature gradients.  The particular temperatures and

8    pressures were known in the prior art, but the patents held

9    that by controlling, carefully, the surface temperature

10   gradients, it was possible to grow large single-crystal

11   diamonds with only insubstantial nonmonocrystalline growth.

12           Fenix's motion for summary judgment of the 078 patent

13   boils down to the fact that it's processes result in large

14   amounts of nonmonocrystalline material being grown.  Nouveau,

15   therefore, does not grow single-crystal diamonds on the growth

16   surface as claimed.  That is one of the two claim limitations

17   that I'll be talking about this afternoon --

18           THE COURT:  I don't understand what your second point

19   adds to your first point.  You say Nouveau does not grow a

20   single-crystal diamond because Nouveau's process results in

21   large amounts of nonmonocrystalline materials.  Fine, if you're

22   right on that, you prevail as to this patent, but then you say

23   nonuniform growth also establishes the gradient's limitation

24   has not been met.  How do I even reach the second point?

25           MR. AIRAN:  I think they're related, to be sure, but

KBOCCARC

| | |
|---|---|
| 1 | they are independent.  Well, maybe if I move forward in the |
| 2 | actual claim, which I have up on the screen now, there are two |
| 3 | limitations.  The first limitation is controlling the |
| 4 | temperature of a growth surface, such that all of temperature |
| 5 | gradients across the surface are less than 20 degrees C.  The |
| 6 | second is the kind of limitation in growing single-crystal |
| 7 | diamonds on the growth surface.  So you have to do both of |
| 8 | those things.  If, by some different technology, you are able |
| 9 | to grow single-crystal diamonds on the growth surface, that |
| 10 | does not involve maintaining the temperature gradient to less |
| 11 | than 20 degrees C, you also would not infringe the claim. |
| 12 | Does that answer the Court's question? |
| 13 | THE COURT:  Well, I hear what you're saying.  It seems |
| 14 | to me that the reason you say that Nouveau is not maintaining a |
| 15 | temperature gradient of less than 20 degrees is because there |
| 16 | is more than insubstantial nonmonocrystalline growth.  But, all |
| 17 | right, anyway, go ahead. |
| 18 | MR. AIRAN:  That's correct.  In this case, your Honor, |
| 19 | I think that showing the nonmonocrystalline growth in the |
| 20 | Nouveau process means that you're not practicing either |
| 21 | limitation.  I do agree with that.  So, they are related in |
| 22 | that sense, that the surface morphology establishes, when you |
| 23 | see the substantial nonmonocrystalline growth, that surface |
| 24 | morphology establishes that the growth surfaces have not been |
| 25 | maintained less than 20 degrees. |

KBOCCARC

1          So, looking at the claim limitation, I did want to

2     state the second limitation first, which is the growing

3     single-crystal diamonds on the growth surface.

4          As I mentioned earlier, the Court construed a couple

5     claim terms here.  Single-crystal diamonds was a term that was

6     disputed by the parties, and the Court did construe that term

7     to mean a standalone diamond having insubstantial

8     nonmonocrystalline growth.  That construction is consistent

9     with the central teaching of the patent, which is, it is

10    possible to grow large, high-quality, single-crystalline-growth

11    diamonds under certain conditions.  According to the patent,

12    the example in the patent shows a single-crystal diamond being

13    grown with only a small degree of polycrystallinity located at

14    the top edges of the diamonds.  And that's at the bottom of

15    column 13 of the patent spanning onto column 14.

16         In the Court's plain construction, the Court held that

17    all parties appeared to agree that a skilled artisan would read

18    this term to refer to the surface on which diamond growth is

19    occurring in the given moment, and that the area constituting

20    the growth surface changes over time.  And that only makes

21    sense because, as you put the diamonds into the CVD chamber,

22    the material, the hydrocarbons are accruing under the growth

23    surface, which is growing over time.

24         And the Court rejected the plaintiff's construction at

25    that time, which sought to restrict the term, growth surface,

KBOCCARC

1   to adjust the area where the single crystal was growing, not

2   the entire growth surface.  And the Court resolved that

3   question at the time of the Markman order and said the

4   plaintiff's proposed construction would wrongly restrict the

5   term.

6          Further, the Court went on to say that, even where its

7   methods of growing single-crystal diamonds is followed, small

8   amounts of polycrystalline diamonds will nonetheless grow in

9   localized places on the diamond, and that such areas should be

10  included within the definition of the growth surface.  And,

11  again, the Court was careful to note that the surface is the

12  entire surface with a hydrocarbon gas for growing the diamond.

13  And the conclusion from that section was that the construction

14  of the term, growth surface, was therefore not polycrystalline

15  growth.

16         Your Honor, some of these slides, such as slide 18, do

17  contain material that Nouveau believes is highly confidential,

18  and we would ask that those images specifically not be released

19  to the public, but I think we can talk about this in a

20  qualitative sense without going into a private record.

21         So, what we have up on the screen right now is some

22  images that show very, very substantial nonmonocrystalline

23  growth; so, that is an example.  In these photos throughout the

24  case, these are typical batches, and they show that there is

25  more than insubstantial nonmonocrystalline growth being grown

KBOCCARC

in the Nouveau process.  Slide 19 includes some additional

photos of what the typical Nouveau batch would contain.

When you look at the Court's claim construction versus

the plaintiff's theory of infringement, it's simply

irreconcilable.  We put, on the left side of that table, the

Court's claim construction; the right side of the table

includes the plaintiff's theory of infringement.  Looking at

the first row, the Court's construction states the term, growth

surface must therefore not exclude polycrystalline growth.  And

when we look at what Dr. Kipano, who is plaintiff's expert, in

his expert report, he says he does not interpret growth surface

to include the polycrystalline diamond that grows in the

periphery of the single-crystal diamond.  That statement is

flatout irreconcilable with the Court's claim construction.

The next item in the table, also, is the same way.

The Court says the plaintiff's construction would wrongly

restrict growth surface to include only surface area where the

single-crystal diamond is growing, whereas Dr. Kipano and

plaintiff's expert says, and plaintiff adopts, the growth

surface is the region where single-crystal diamond grows and

does not include the surrounding area.  That's a repudiation of

the Court's claim construction.  That's going back to what they

had proposed to the Court in the Markman briefing, which is the

growth surface only includes the single-crystal diamond.

Finally, the last item we put up on the table was

KBOCCARC

1    where the Court said the growth surface refers to the entire

2    surface where hydrocarbon gases are accruing, the witness --

3    the expert, on behalf of plaintiff, testified, when I asked

4    him, are you willing to include the entire surface upon which

5    the hydrocarbon gases are accruing as part of the definition,

6    he rejected that concept.

7             So, here, we see three specific instances where the

8    plaintiff's theory of infringement is just flatout inconsistent

9    with the Court's claim construction.

10            Again, looking at the view 10 from the Nouveau

11   affidavit where the plaintiff has taken the position that if

12   that black material, which is considered in the industry to be

13   polycrystalline material, is included, then there is no

14   infringement.  The plaintiff's expert says that he believes

15   that it does contain polycrystalline diamond, but that is not

16   part of the growth surface.  So, we don't have a factual

17   dispute here.  What we have is a dispute relating to claim

18   construction.

19            Under federal circuit law where the parties do not

20   dispute any relevant facts regarding the accused product, but

21   disagree over possible claim interpretations, the question of

22   literal infringement collapses into claim construction and it

23   is amenable to summary judgment, and that is precisely what we

24   have here.  The Court has already construed the claims, and

25   under the Court's claim construction, it's a matter of whether

KBOCCARC

1    the growth surface includes the nonmonocrystalline material or

2    whether you construe the growth surface to mean only the single

3    crystallin material.

4            Accordingly, plaintiffs did not seek --

5            THE COURT:  I get this point, even without what you're

6    about to add to it.

7            MR. AIRAN:  Fine, I'll move on.

8            THE COURT:  Well, because I thought your colleague

9    also wanted to be heard and you've got, collectively, 8 minutes

10   left.

11           MR. AIRAN:  Okay.  There is just one quick point I

12   would like to make here, let me get to it.

13           Under the plaintiff's theory of infringement here and

14   is, I believe, slides 10 and 11 of their infringement theories,

15   they refer to single-crystal material.  They have a rocking

16   curve analysis and then they show diced single-crystal

17   diamonds, and I wanted to point out to the Court that that is

18   not the as-grown diamond.  That is the diamond after it's been

19   cut, polished, annealed, and post-processed; that is not what

20   the claim is directed to.  The claim is directed to growing

21   single-crystal diamonds and it is not directed to these

22   post-processing steps where you're able to extract, from a

23   polycrystalline diamond, some small amount of single crystallin

24   material and say, aha, because you were able to do it and refer

25   it to the claim.  That works backwards and avoids the exact

KBOCCARC

1   problem that the patent is designed to -- so Nouveau is doing

2   what the 078 patent disparages.

3           One other quick point on the plaintiff's theory.

4   Single growth or growth of single-crystal material is possible,

5   certainly, that's the teaching of the 078 patent.  In addition,

6   Dr. Helmly, who is one of the inventors on the patent,

7   testified that, in the example of what small amounts of

8   localized polycrystallinity would look like, he said it would

9   be about 1 percent.  Since then, diamonds have been produced

10   with no polycrystalline growth on the edges -- this is all

11   documented in the slides and we pointed to the citations in the

12   records for that point.  I just wanted the Court to be aware

13   that plaintiff is not correct in the factual matter, that it is

14   not possible to grow single-crystal diamonds without this

15   substantial nonmonocrystalline growth on the edges.  That

16   certainly is possible, that's what the patent teaches, the

17   inventor said it's possible and the literature shows that it's

18   possible.

19           The last point I'll leave you with and then I'll turn

20   it over to my colleague, and this may be the most important

21   point in connection with this issue.  In his expert report,

22   Dr. Kipano said that if the parasitic non-diamond or

23   polycrystalline diamond material that grows during diamond

24   production was considered to be part of the growth surface, one

25   would not be growing single-crystal diamonds on the growth

KBOCCARC

1    surface as required by the claim.  So, he was talking very

2    specifically about that claim limitation, growing

3    single-crystal diamonds on the growth surface.  And he

4    admitted, right there, that there is no infringement if you can

5    consider the polycrystalline diamond material to be a part of

6    the growth surface.  So that statement right there establishes

7    that if that material is considered, and it properly is

8    considered, there is no infringement of the 078 patent.

9            With that, I'll turn it over to my colleague on the

10   189.

11           THE COURT:  Okay.

12           MR. SKLAR:  Your Honor, I just have some few brief

13   comments about the 189 patent.

14           In our view, summary judgment is proper at this time,

15   and this is explained on slides 30 through 34, with our

16   position leading up to some developments last week, based on

17   the full summary-judgment record and all of the discovery that

18   has taken place at this point.

19           Plaintiffs are no longer pursuing a claim of

20   infringement of the 189 patent, despite the allegation of

21   infringement and even willful infringement in the original

22   complaint.  The 189 -- and I'm on slide 32 -- requires certain

23   pressure that annealing takes place.  Nouveau annealed this

24   diamond, so this is the process that occurs -- annealing occurs

25   after the growing of the diamond that my colleague was talking

KBOCCARC

1    about with the 078 patent.  Nouveau used less than that

2    pressure.  Plaintiffs don't contest that -- and I'm on slide

3    33.  There is no --

4            THE COURT:  What they're saying is, if I recall

5    correctly, is that their counterclaim is still alive to the

6    extent it seeks attorneys' fees.

7            MR. SKLAR:  That would be our counterclaim, your

8    Honor.

9            THE COURT:  Oh, yes.

10           MR. SKLAR:  Our counterclaim -- this is really to our

11   add, today, which, basically, is a new development.  This is

12   outside of the summary judgment briefing, and this is our

13   slides 35 to 37.  We figured the issue would come up.  It was

14   presented last Friday in an exchange of emails with Mr. Mandel.

15           Plaintiffs have now said they are going to withdraw

16   their claim of infringement of the 189 patent with prejudice,

17   no longer without, as they indicated in their summary judgment

18   papers, has now been with prejudice.  There is a covenant not

19   to sue that they also indicated, but in our view dismissal --

20   summary judgment is proper, even despite their proposal to

21   dismiss the case with prejudice and presumably seek to have

22   dismissal -- I'm sorry -- Fenix's counterclaims of invalidity

23   and unenforceability.

24           Rule 4182 is applicable here, and that is applicable

25   even if there is -- it's a with-prejudice type of dismissal.

KBOCCARC

1    There is a case we cite on slide 35, the Chun case out of the

2    Central District of California wherein exactly these

3    circumstances, the Court denied a motion to dismiss in an

4    effort to remove counterclaims and said summary judgment is

5    proper and granted summary judgment of noninfringement.  That's

6    the *Chun v. Vaporous Technologies* case, 2018 WL 2754506 at

7    slide 35.  I think --

8          THE COURT:  Again, this is all just words, except for

9    the question of attorneys' fees.

10          MR. SKLAR:  There is an issue, your Honor, with the

11   covenant that I wanted to raise -- and this is our slide 37,

12   the last slide.  We do not believe the covenant not to sue

13   gives the certainty that Fenix is looking for in this

14   litigation, and certainty is the opportunity to pursue a

15   validity and unenforceability of the 189 patent.  Plaintiffs

16   certainly sued us and alleged, not only infringement, but

17   willful infringement, but we believe there is at least the

18   possibility that this issue will not be removed completely by

19   the covenant not to sue if Fenix turns to another manufacturer

20   of CVD diamonds.  As my colleague said, Fenix does not

21   self-manufacture, so it could purchase CVD diamonds from

22   another source and be faced with infringement again based on

23   the covenant not to sue and therefore, at this time, at this

24   late date, this 11th hour grant of a covenant not to sue should

25   not preclude Fenix from pursuing invalidity and ethical conduct

KBOCCARC

1    that's also in the case.

2           There are certainly policy concerns here raised, as

3    addressed by several cases, including strong descent by Judge

4    Dyk of the Federal Circuit in the *Genentech* case that's

5    following up on the Supreme Court's decision in *Cardinal*

6    *Chemical*.  There should be a right of a defendant in this

7    situation to pursue invalidity counterclaims, and we want to

8    make sure we're not waiving our rights to pursue this issue at

9    the Federal Circuit or beyond if it comes to it.

10          So, there are issues of attorneys' fees that we

11   believe we are entitled to pursue on all issues, including the

12   189 by plaintiffs.  So apparent giving up at the 11th hour

13   after all expert discovery, fact discovery on the 189 patent.

14   We certainly -- we're surprised, on the eve of the hearing, to

15   get this covenant not to sue.

16          THE COURT:  Thank you very much.  I'll hear from your

17   adversary.

18          MR. WIKBERG:  Thank you, your Honor.  This is Terry

19   Wikberg from Perkins Coie for plaintiffs.

20          Speaking first today will be Matthew Moffa, so I will

21   hand it over to him.

22          THE COURT:  Okay.

23          MR. MOFFA:  Good afternoon, your Honor.

24          And may it please the Court, I think there is a wide

25   difference of opinion between the plaintiffs and defendants in

KBOCCARC

1    a few matters, but certainly, our position is that we have

2    raised a triable issue of fact supported by evidence and

3    Fenix's own admission as to whether they are growing

4    single-crystal diamond on the growth surface of their diamonds.

5         I will briefly address the comments of Mr. Airan

6    regarding claim construction and otherwise explain plaintiff's

7    position, which I don't think has been characterized

8    accurately.  I also want to take a few minutes just to address

9    an overarching evidentiary concern that the plaintiffs have

10   with what the evidence that the defendants are trying to rely

11   on for summary judgment.

12        If I may show my screen?

13        THE COURT:  Yes.

14        MR. MOFFA:  Can you see that, your Honor?

15        THE COURT:  Yes.

16        MR. MOFFA:  Thank you.  Regarding the claim

17   construction, and this is dangerous territory to try and

18   explain in a Court's order to the Judge, but we believe that

19   Fenix is extrapolating, quite widely from the Court's Markman

20   order to generate their non-infringement position.

21        Now, our understanding is, during claim construction,

22   the plaintiffs proposed a construction of growth surface

23   containing the phrase, single crystal.  And if we understand

24   the Court's order, the Court recognized that the patent used

25   that term, growth surface, both in conditions where

KBOCCARC

single-crystal diamond was grown and polycrystalline diamond was grown.  So, the Court gave it plain and ordinary meaning and declined to import the limitation of single crystal into the meaning of growth surface.  And on page 19, the Court said that the surrounding context, in which that term was used, would determine its scope.

So, plaintiff's expert accordingly read the claims and read the terms, growth surface and growing single-crystal diamond in the context of the claims.  Plaintiff's expert has shown how Fenix grows single-crystal diamond on the growth surface, irrespective of what it might grow on the sides or between the diamond seeds that it uses.

If I may, your Honor, I'm going to show an image, and this image is a highly confidential image, it was referenced by my colleague and I'll be careful not to, on the record, reveal any of the confidential information.  But, the fact that Fenix -- it admits that a single-crystal domain grows on each seed in their process, that polycrystalline material is grown around each single-crystal domain, and as shown on the slide, there is a treatment and that polycrystalline material does not remain there anymore.  So, what Fenix has is a diamond with insubstantial polycrystalline diamond and insubstantial graphite inclusions; those are two admission that Fenix makes about the diamonds that they sell, that are grown by Nouveau and sold.  Plaintiff's expert arranged, as defendants noted, a

KBOCCARC

very rocking curve analysis.  This is the standard analysis in
the field of Fenix's diamonds to determine that those diamonds
were single-crystal diamonds.

So, the short answer is that Fenix is infringing the
claims or that the Nouveau process infringes the claims.  The
diamonds that Fenix imports and sells are single-crystal
diamond, and that was single-crystal diamond that was grown on
the growth surface, notwithstanding the removable material that
may be between the seeds.

It's fundamental, in patent law, that a claim is
infringed if every step is performed, even if additional steps
are performed, too.  Inventions build on each other.  Nouveau
may have developed a commercially viable way to grow multiple
diamonds from multiple seeds by growing additional stuff
between the seeds, but the patent is still infringed, the claim
is still infringed whether or not they do extra things, and
they admit that all that extra can be removed, and the diamond
is then sold.

I think our position is quite simple.  I will only
point out that, in a number of the slides that the Fenix has
shown, they rely on disputed statements of fact saying that
there have been diamonds produced with no polycrystalline
growth, saying that Dr. Helmly testified the growth would be
about 1 percent; those are disputed statements as they take
statements out of context, they take expert statements out of

KBOCCARC

1    context from the record and that just highlights how there are

2    disputed issues of fact behind the summary judgment, it's not

3    simply a matter of the parties read the claims differently.

4    Our expert has, with multiple sources of evidence and

5    admissions, shown that they grow single-crystal diamond with

6    insubstantial nonmonocrystalline growth on the growth surface

7    in their process.

8              Your Honor, if I may turn to the evidentiary issues?

9              THE COURT:  Yes.

10             MR. MOFFA:  I think this is an overarching concern and

11   I think our papers do a good job, but there are things raised

12   for the first time in reply and I want to make sure we get to

13   address it.

14             We have raised a question under rule 56(c) whether the

15   evidence provided is appropriate for summary judgment.  The

16   defendants' reply that the Court can rely on any material that

17   will be admissible at trial, but I want to point out that the

18   burden is on the proponent to show that the material is

19   admissible or how it would be admitted.  Now, summary judgment

20   deadlines were set early in this case, and had Fenix wanted to

21   move for summary judgment, it was their burden to provide the

22   Court with admissible, reliable evidence on which to grant

23   their motion, but they have not done so.

24             Let me just briefly summarize the unconventional

25   manner in which the evidence was provided here.  You may recall

KBOCCARC

1      that plaintiffs brought an early motion to compel production of

2      documents from Nouveau, and the Court denied that motion.  In

3      that denial, Fenix's counsel represented to the Court they have

4      no control over Nouveau, that Fenix is not allowed to see

5      Nouveau's documents or learn Nouveau's process, and that

6      Fenix's counsel doesn't represent Nouveau.  Despite those

7      representations, Fenix's counsel has repeatedly communicated

8      with Nouveau during this case without providing those

9      communications to us.  They've asked Nouveau for videos,

10     photos, documents, they've given them instructions to perform

11     certain experiments.

12            Then Fenix's counsel has Bates stamped and emailed

13     those documents to us.  They were not produced by Nouveau.

14     Nouveau never responded to a third-party subpoena.  And, your

15     Honor, although there was a Hague evidentiary request that was

16     issued and testimony has been taken, the Court declined to

17     order the production of any documents.  So, the documents that

18     we have, the documents that Fenix is relying on, these have

19     been informally produced.  They've been given by Nouveau to

20     Fenix, and we presume Fenix has sent all of them to us, but we

21     don't know, and despite bearing the burden, they haven't

22     demonstrated any of that in their summary judgment papers.

23            There are two cases that Fenix cites, *Salvino* and

24     *Jacobs*.  Those each involve undisputed facts in business

25     records of the movant itself, that these are not Fenix's

KBOCCARC

1   business records.  These are purportedly from a third party.

2   Now, there are two main sources that they use in summary

3   judgment; an affidavit of the manufacturer and dozens and

4   dozens of documents that were emailed in this manner.

5          And let me just state some of the facial issues.

6   Again, these are new arguments on reply, so I apologize, your

7   Honor, but you do have the slides to show our position.

8          The affidavit is not proper evidence under Rule 56.

9   First of all, it's signed by two parties.  There is no such

10  thing as joint testimony in the United States.  You can't

11  segregate which declarant made which statement.  It's not sworn

12  under penalty of perjury under the laws of the United States,

13  which would make it an admissible declaration under 28 U.S.C.

14  1746.  It wasn't notarized by a U.S. notary, it wasn't taken to

15  an embassy, they have not sought a Hague convention at this

16  deal.  So they call it an affidavit, but it's not an affidavit,

17  so it's not self-authenticating.  Also, a new argument on reply

18  that they call the affidavit a party admission because our

19  expert has cited to it, but their authority doesn't stand for

20  that proposition at all.  That authority involves --

21          THE COURT:  Wait.  I don't think you need to spend

22  more time on that point.  I'll hear what they say in rebuttal,

23  but I'm not inclined to think it's a party admission.

24          MR. MOFFA:  Thank you, your Honor.

25          Again, just the conditions under which it was provided

KBOCCARC

1    are certainly unconventional.  Fenix's counsel can't present
2    this evidence on the stand, even though that's our source of
3    it.  It can't be introduced by a Fenix employee because they
4    represented to the Court that Fenix's employees aren't allowed
5    to see it.  However, they might plan to sponsor this evidence
6    or get it in, it behooved Fenix to take those steps before
7    bringing a summary judgment motion.
8         The remaining documents are from the same flaw.
9    Remember Rule 56(c)(4) says, just because you put it in an
10   affidavit doesn't circumvent the admissibility requirements for
11   the evidence in that affidavit, the images, the photos, the
12   videos; none of these were provided by Fenix's counsel.  And at
13   base, Fenix never made a Hague request for this information;
14   plaintiffs did.  Fenix's papers give no basis to accept their
15   evidence; plaintiffs, at trial, are prepared to introduce their
16   evidence --
17        THE COURT:  Let me ask you this, I think, again,
18   subject to hearing from your adversary, I think you have a
19   stronger argument as to these documents than you do as to the
20   affidavit.
21        Can you cite me to a case where a Court excluded an
22   affidavit at the summary judgment stage because there were
23   multiple affiants or because the oath was not taken before an
24   American notary or the like?
25        MR. MOFFA:  Well, I certainly think that the

KBOCCARC

```
 1    definition of affidavit within the federal rules and statutes

 2    is clear about --

 3              THE COURT:  Yes, but I'm asking for case law.

 4              MR. MOFFA:  I don't have a case at hand.  I will tell

 5    you I have seen multiple cases in which the Court has

 6    considered that argument, where the argument has been raised

 7    there two declarants and joint testimonies are permitted.  The

 8    Court passed on the issue or found other bases.

 9              THE COURT:  I have one other question, what's the

10    status of your Hague convention request?  Are they completed

11    now?

12              MR. MOFFA:  Yes, your Honor.  The testimony has been

13    taken.  Again, the Indian court permitted testimony, but not

14    the production of documents for inspection.  That testimony is

15    undergoing a formal translation right now and we will be able

16    to present it to the Court as soon as that English translation

17    is completed because it was taken in Gujarati.  But, again,

18    plaintiffs have taken the steps they need.  I think the

19    defendant's argument that, well, how are plaintiffs going to

20    make their infringement case --

21              THE COURT:  Let me ask, why did you sue Nouveau to

22    begin with?

23              MR. MOFFA:  An excellent question, your Honor, of

24    course.

25              There is two reasons to explain that.  One,
```

KBOCCARC

infringement of a U.S. patent has certain limitations on extra

U.S. parties.  This is exactly what 35 U.S.C. 271(g) was

designed to address.  It was designed to address the flaw in

patent law which a party could avoid infringement of a U.S.

method patent by performing the method overseas or purchasing

from someone who does.  So this is its own act of infringement.

          But, your Honor, maybe more importantly, as the Court

might remember, all the public information that plaintiffs had

in the case where Fenix was the manufacturer of its own

diamonds; that's why we brought a motion to your Honor seeking

to compel production of the manufacturing process.  In

response, Fenix says that's all market puppetry, those are

exaggerated statements, we said we're the manufacturer, we have

top-to-bottom chain of manufacturing, but that's really not

true.  That was after the deadline for amended pleadings had

come and gone.  So we weren't informed that Fenix, even though

their public representation was that they were a grower and

manufacturer of diamonds, quote-unquote, that they actually had

an alleged third party with no connection to them.  At that

point, our option was to go through the Hague process, we

immediately took that up.

          But, again, I think it's a red herring because 271(g)

is written exactly to capture a U.S. importer of goods

manufactured, according to a U.S. patent overseas, and that's

the basis on which we're suing them.

KBOCCARC

1          THE COURT:  All right.

2          MR. MOFFA:  Your Honor, if you have any questions

3     about the other argument, the gradient argument that the

4     defendants didn't raise, I'm happy to hand that to my

5     colleague, Michael Chajon, otherwise I'll let Mr. Wikberg

6     address the comments regarding the 189.

7          THE COURT:  Okay.  Go ahead.

8          MR. WIKBERG:  Your Honor, this is Terrence Wikberg.

9     I'll be addressing the 189 issue Mr. Sklar discussed.  We're

10    frankly a bit surprised we are where we are.  I'll first

11    address a characterization made --

12         THE COURT:  Forgive me for interrupting.  As I

13    indicated in my question to your adversary, to me, the issue

14    here, and there may be other issues, but the one that strikes

15    me as being nonmoot is the attorneys' fees issue.  Why isn't

16    that relevant?

17         MR. WIKBERG:  Well, I agree that may -- that is

18    probably the only thing remaining.  Our covenant not to sue

19    addresses the full scope of the case and therefore, in our

20    opinion, removes subject matter jurisdiction from the Court on

21    any other decision.  Under Rule 41, that does not change or

22    otherwise alter Article 3, and so based on the covenant not to

23    sue and our offer to bring a motion to withdraw with prejudice,

24    we believe removes subject matter jurisdiction from the Court.

25         Now, we're leaving only 285, we certainly agree with

KBOCCARC

1    that.  But I want to address, a little bit, some of the

2    characterizations made by Mr. Sklar in the alleged extensive

3    discovery.

4          As you heard from Mr. Moffa, later in the case than

5    would have been ideal, we were informed of this third-party

6    manufacturer.  We endeavored, over and over, to receive

7    documentation production discovery on the annealing process

8    used by Nouveau.  The only, and I'll call it evidence, but

9    arguably it is not, that we received regarding the annealing

10   process used by Nouveau was three sentences in the declaration

11   that Mr. Moffa referenced.  We've received no documents, we've

12   received no testimony, we repeatedly asked and we're told,

13   well, we, Fenix, don't know anything about it, you have to go

14   to Nouveau, and that's why we tried to go through the Hague,

15   which was successful, but because of COVID, was very -- was

16   significantly delayed.  And, in fact, as proceedings were going

17   in India, Fenix lodged various objections and oppositions to

18   further delay the process.  So, realizing, as the expert report

19   dates were rapidly approaching, realizing we simply had no

20   evidence, no information, no discovery that we could use to put

21   together an infringement case on the 189, we had to accept that

22   fact.

23         On August 28, I sent an email requesting a meet and

24   confer on a motion to withdraw the 189 from the case.  That

25   offer was ignored, it was never responded to.  I repeated that

KBOCCARC

1    request later, yet again, as expert discovery and expert

2    reports were going on and, again, it wasn't responded that we

3    don't want to talk or -- it was simply there was no response

4    after numerous requests.

5            We were surprised to see the motion on the 189 come

6    for summary judgment and we, because of our art, we told them

7    numerous times, prior to briefing and prior to expert reports,

8    that we will no longer pursue the 189.

9            The first time we met and conferred on the 189 was

10   yesterday, your Honor.  Even after last week, after reviewing

11   further case law, looking where we were in the case, we said,

12   okay, we will make an offer to bring a motion to withdraw with

13   prejudice and we've provided a fully -- a covenant not to sue,

14   as seen on slide 23 here, which extends the full scope of the

15   litigation.  In the meet and confer yesterday, we were still

16   surprised to hear that the defendant, Fenix, does not believe

17   that this is a proper covenant not to sue and would oppose our

18   motion to withdraw the claims with prejudice.

19           They have provided no basis or understanding as to why

20   the Court still has subject matter jurisdiction, and we

21   certainly take issue with their representation that they've

22   produced extensive discovery and information on the annealing

23   process, and this was a last-minute, 11th-hour withdrawal that

24   they've known since at least late August that we will no longer

25   pursue the 189 patent.

KBOCCARC

1          So, your Honor, based on this covenant not to sue and

2     our offer for a motion to withdraw with prejudice, we feel that

3     the Court no longer has subject matter jurisdiction on any of

4     the claims, both our offensive claims and the counterclaims --

5          THE COURT:  Just at the risk of beating a dead horse,

6     if someone brings a claim or counterclaim that, among other

7     things, asks for attorneys' fees in a situation where, at least

8     in theory, attorneys' fees are legally orderable, and the other

9     side then withdraws its claim, says we're no longer pursuing

10    that, we dismiss with prejudice, et cetera, et cetera; why does

11    that deprive me of jurisdiction over the attorneys' fee issue

12    that I previously had jurisdiction over?

13         MR. WIKBERG:  It does not deprive you of the 285

14    issue, your Honor.

15         THE COURT:  Okay, that's what I just wanted to clear

16    up.

17         MR. WIKBERG:  No, that's not our position.  It does

18    not, but it does deprive the Court of subject matter

19    jurisdiction on the remainder of the claim.

20         THE COURT:  Now I understand your argument.  Let me

21    hear, finally, from moving counsel in rebuttal.

22         MR. AIRAN:  Your Honor, this is David Airan again.

23         Just a couple of quick points.

24         One is on the question of evidentiary issues.  On

25    April 6th, the affiants for that affidavit were identified --

KBOCCARC

1          THE COURT:  I don't understand how you can have an

2     affidavit signed by two different people.  If we were to then

3     have a trial, are you saying they would simultaneously take the

4     stand?

5          MR. AIRAN:  No, your Honor.  I believe that both

6     affiants were attesting to the truthfulness of all the

7     statements that were made in the affidavit.

8          And your Honor asked for some case law, I do have some

9     case law for you on this point.

10          THE COURT:  Okay.

11          MR. AIRAN:  So, *Padilla v. Troxell* is one case, it's

12     reported at 2016 WL 4098588, and that's from Western District

13     of Virginia, July 28, 2016.  Another case is *Baker Hughes v.*

14     *Homa*, that's reported at 2012 WL 1551727, that's out of the

15     Southern District of Texas in April of 2012.

16          Both of those cases hold that swearing before a notary

17     and declaring under penalty of perjury in the respective

18     countries was admissible in the United States.  It refers to --

19     both of the cases refer to FRE9028.  These are authenticated,

20     as long as they're sworn to a notary and declared under penalty

21     of perjury of the respective country --

22          THE COURT:  I'm not so troubled by the two affiants,

23     but I'm more troubled by things outside the affidavits, the

24     other materials.

25          MR. AIRAN:  If I may, your Honor, if I may switch my

KBOCCARC

1    screen for just one moment to address that issue.

2           There is a case that we have not cited in our paper

3    because, frankly, we didn't anticipate the extent to which

4    plaintiffs would be making this argument.  This is the *Exigent*

5    *Technologies v. Atrana Solutions*, it's reported at 442 F.3d

6    1301, it's a Federal Circuit case from 2006.  I don't know if

7    you can see that, your Honor --

8           THE COURT:  Yes, I can see it.

9           MR. AIRAN:  So, the argument here is very similar to

10   what the plaintiffs are making.  The argument is actually

11   similar to what the plaintiffs are making here, that our

12   *Atrana's* summary judgment motion is not supported by admissible

13   evidence established by noninfringement.  The Court of Appeals

14   went on to say, in light of seller tax, the Supreme Court

15   decision, we conclude that nothing more is required in the

16   filing of a summary judgment motion stating that the patentee

17   had no evidence of infringement, and pointing to the specific

18   ways in which the accused system did not meet the claims of the

19   case.

20          So, Fenix has no burden here, contrary to what

21   Mr. Moffa and Mr. Wikberg were saying.  Our sole burden in due

22   of Exigent is to point to the absence of the ability of

23   plaintiff to prove a limitation.  That's what we've done here.

24   We've gone beyond that.  We've relied on Nouveau and we pointed

25   to, recently in the record, why Nouveau's evidence is very

KBOCCARC

1      compelling --

2              THE COURT:  What about the broader, if you will, kind

3      of equitable argument that they make?  They sued you because

4      they had no knowledge of Nouveau.  You said, oh, yeah, it's the

5      stuff comes from Nouveau, but they're an independent third

6      party, you'll have to go through the Hague convention and all

7      like that, but, lo and behold, Nouveau now furnishes you with

8      all these materials.

9              MR. AIRAN:  So, in a Pasquel matter, I don't think the

10     record is correct that's supported by Mr. Wikberg and

11     Mr. Moffa.  This lawsuit was filed on January 9th, they amended

12     their complaint on March 5th in response to communications that

13     we had with them.  On April 6th, which was the first day for

14     initial disclosure, plaintiffs identified the two affiants;

15     Mr. Bakul Umbiasaya and Sharaguli Umbiasaya.  They were aware

16     of them prior to the initial disclosures.  They knew about the

17     existence of these people and their technologies.  They made a

18     conscious decision not to pursue it.

19             Mr. Moffa said earlier, they relied on 271(g), which

20     does exemplify their dependent.  They can say we're not going

21     to go after the manufacturer, we're not interested in it, we're

22     only going pick on the reporter, but that doesn't preclude them

23     from going after the manufacturer, and they were aware of the

24     manufacturer because they identified them in their very first

25     initial disclosure in this case.  If they wanted to pursue that

KBOCCARC

discovery, they could have brought -- they could have at least

attempted to bring them in, whether or not that would have been

successful, and Nouveau would have gone quietly or not or

opposed that motion, but that would have been an issue for the

Court to resolve.  They did not even attempt to do that, except

they proceeded the Hauge for discovery.

            And I'll point out, also on the record, that they

applied for email or for authority from the Court to pursue the

Hague on, I believe, May 22nd, and the Hague letter was

submitted on May 27th, and the Court authorized it on June 3.

If they felt that it was necessary at that point to try to

bring in Nouveau because the Hague was going to be flawed,

surely they could have come back to the Court and said, we can

get process over them via the Hague, and we think in this case,

given Fenix's limited ability to get the discovery, we need a

manufacturer, so allow us to amend the complaint to add them as

a manufacturer.  They never did that, your Honor, and they

never attempted to even bring them into the --

            THE COURT:  All right.  So, I am sorry, because I have

a 4:30 matter, we have to bring this to a close.  I want to

thank counsel for their excellent arguments.

            MR. WIKBERG:  Your Honor, could I just respond?  I

don't think I hear Mr. Airan saying that there is a basis for

suing Nouveau under U.S. law.  I heard repeatedly --

            THE COURT:  No, he danced around it, but I understand

KBOCCARC

1     the --

2                MR. WIKBERG:  Thank you, your Honor.

3                THE COURT:  So, last night, I told my wife I'm going

4     to be hearing a really interesting argument on some very

5     interesting patent issues and she asked me to explain it and I

6     did my best.  She gave me a look and said, you call that

7     interesting?  But I do, I find it very interesting.  And so, it

8     will take me a little while to get you an opinion, but I will

9     do so as promptly as possible.  And I do thank all counsel for

10    their excellent arguments.  And that concludes this proceeding.

11    Thanks very much.

12                              *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25